MCGRAIL & BENSINGER LLP
676A Ninth Avenue #211
New York, New York 10036
(646) 290-6496
(646) 224-8377 Facsimile
David C. McGrail (DM 3294)

Counsel to YCMTSU, LLC (f/k/a HydroGen, L.L.C.)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| YCMTSU, LLC (f/k/a HydroGen, L.L.C.), | ) | Bankr. Case No.: 08-14139 (AJG) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**LAW OFFICES OF DAVID C. MCGRAIL'S AND
MCGRAIL & BENSINGER LLP'S REPLY TO THE UNITED
STATES TRUSTEE'S OBJECTION TO ITS FINAL APPLICATION FOR
ALLOWANCE OF COMPENSATION FOR PROFESSIONAL SERVICES
RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED
<u>FROM OCTOBER 22, 2008 THROUGH AND INCLUDING AUGUST 18, 2011</u>**

       Law Offices of David C. McGrail and McGrail & Bensinger LLP (together, the

"Firm") hereby files this reply to the objection (the "Objection") of the United States Trustee

(the "UST") to its final application (as amended, the "Final Fee Application")[1] for an order

awarding it reasonable compensation for actual and necessary services rendered to YCMTSU,

LLC (f/k/a HydroGen, L.L.C.) (the "Debtor"), and states as follows:

---

[1]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Final Fee Application.

## PRELIMINARY STATEMENT

1.      The UST objects to the Final Fee Application on two grounds: (1) that the Firm purportedly failed to disclose its $15,000 carve-out (the "Carve-Out") in connection with what the UST describes as a "new settlement agreement" and (2) that the Firm should not receive the benefit of the Carve-Out or its $20,000 retainer (the "Retainer") because the case is administratively insolvent.  It requests that the Carve-Out and the Retainer be disgorged.

2.      The Carve-Out was agreed to, in writing, among the Committee, the Agent, the Debtor, and the Firm.  It was clearly disclosed in the Firm's second interim fee application, which was served on the UST and approved by the Court, as well as in the Final Fee Application.

3.      The Retainer was a condition to the Firm's agreement to represent the Debtor and was clearly disclosed in the Firm's retention application and first interim fee application, which were both served on the UST and approved by the Court, as well as in the Final Fee Application.  Case law overwhelmingly holds that a professional in an administratively insolvent case is not somehow stripped of the benefit of its bargained-for retainer or carve-out.

4.      There is absolutely no basis to disgorge either the Carve-Out or the Retainer.

## GENERAL CASE BACKGROUND

5.      On October 22, 2008, the Debtor filed with this Court a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

6.      On November 19, 2008, this Court entered an order, among other things, establishing procedures by which the Debtor could sell substantially all of its assets.

7.      The Debtor marketed all of its assets to potential purchasers, inviting them to bid on assets as a whole or piecemeal.

8. The sale process was a disappointment, as the Debtor did not receive any viable bids on its assets.

9. As a result, in early 2009, the Debtor began soliciting proposals from auctioneers to liquidate its fixed assets. Based on appraisals, the Debtor believed that it would net approximately $768,000 in a liquidation of its fixed assets. The auctioneer proposals, which the Debtor shared with the Agent and the Committee, were consistent with those appraisals. By Order dated April 23, 2009, this Court authorized the Debtor to auction off its fixed assets. The auction was scheduled for May 21, 2009.

10. By Opinion and Order dated May 7, 2009, this Court approved a settlement stipulation (the "Settlement Stipulation") among the Agent, the Committee, and the Debtor. A copy of the Settlement Stipulation is attached hereto as Exhibit A.

11. At the heart of the Settlement Stipulation was the requirement that the Debtor pay the Agent $650,000 by August 1, 2009, in full satisfaction of the Agent's claim.

12. In addition, Paragraph 12 of the Settlement Stipulation provided, "Except as expressly provided herein, this Stipulation may not be modified except in a writing signed by the Parties."

13. Moreover, Paragraph 15 of the Settlement Stipulation provided, "Each of the Parties agrees to execute and deliver, or to cause to be executed and delivered, and to take all such actions as the other parties may reasonably request to effectuate the intent and purposes and to carry out the terms of this Stipulation."

14. The purpose of the Settlement Stipulation was to provide the Agent with a near-term distribution, while leaving funds on the table to administer the case, with the hope of making a distribution to other creditors.

15.     Based on all estimates of the liquidation value of the Debtor's fixed assets, and the existence of other assets, including cash, intellectual property, and litigation claims, the Debtor and, upon information and belief, the Agent and the Committee, firmly believed that the Debtor would not have any problem paying the Agent $650,000 by August 1, 2009.

16.     Unfortunately, the May 21, 2009 auction of the Debtor's fixed assets was extremely disappointing, just as the earlier attempt to sell the Debtor's business as a going concern had been. The auction netted less than $400,000.

17.     Thus, the Debtor simply did not have the funds available to pay the Agent $650,000 by August 1, 2009, as required by the Settlement Stipulation.

18.     Accordingly, to effectuate the intent and purpose of the Settlement Stipulation, the Agent agreed, among other things, to accept payment of $500,000 by November 25, 2009, with potential future recoveries also serving to pay down its claim. While the payment timing was altered out of necessity, the pay-off amount remained at $650,000, as set forth in the Settlement Stipulation. As the Debtor had approximately $565,000 of cash at the time, the Agent permitted the Debtor to retain approximately $65,000 to fund the case ($15,000 of which was allocated to the Firm as the Carve-Out), plus certain future proceeds. To its credit, the Agent did not seek to exact a pound of flesh from the Debtor. Rather, it made certain concessions to ensure that, while it would still receive a near-term distribution (albeit $500,000 rather than $650,000), funds would be available to administer the case and, in particular, to pursue litigation claims.

19.     The Debtor and the estate did not assume any additional obligations in exchange for these concessions, which were memorialized over email on November 20 and 21, 2009. The Agent, the Committee, and the Debtor also all agreed, as part of these email exchanges, that there was no need to seek separate Court approval of the arrangement-- there was

already a Court Order providing for the payment of the $500,000 and the Agent, of course, was entitled to waive its rights and grant concessions under the Settlement Stipulation as it saw fit. A copy of the relevant email exchange from November 20 and 21, 2009 (excluding the prior email trail that contains statements made during negotiations and therefore may be subject to Federal Rule of Evidence 408) is attached hereto as Exhibit B.

20.     At the next hearing before this Court, on December 16, 2009, the Firm informed the Court that the Agent was still owed $150,000. The transcript from that hearing is attached hereto as Exhibit C.

## RETENTION/FEE APPLICATION BACKGROUND

21.     On October 22, 2008, Law Offices of David C. McGrail filed its retention application. Paragraph 29 of that application stated, "The Firm is currently holding $20,000 (the "Retainer") in a segregated, interest-bearing account to secure the payment of the Firm's post-petition fees and expenses, as allowed by this Court. At the conclusion of the Firm's representation of the Debtor in this case, to the extent the unpaid fees and expenses allowed by this Court do not exceed the amount of the Chapter 11 Retainer, the Firm will promptly return to the Debtor's estate that portion of the Chapter 11 Retainer that the Firm does not apply to cover such unpaid fees and expenses." The applicable pages from the retention application are attached hereto as Exhibit D.

22.     The existence of the Retainer was a condition to Law Offices of David C. McGrail's agreement to represent the Debtor in this case. Without the protection afforded by the Retainer, Law Offices of David C. McGrail would not have undertaken the representation.

23.     The retention application certificate of service, which demonstrates that it was served on the UST, is attached hereto as Exhibit E.

24.     On November 19, 2008, pursuant to 11 U.S.C. § 327, this Court entered an order authorizing the Debtor to retain and employ the Firm as its counsel on the terms set forth in the retention application.

25.     On February 2, 2009, the Firm filed its first interim fee application (the "First Interim Fee Application"), covering the period from October 22, 2008 through and including January 31, 2009, seeking $36,930 in fees and $258.38 in expenses.

26.     Paragraph 4 of the First Interim Fee Application stated, "The Firm is currently holding a $20,000 retainer (the "Retainer") in a segregated account to secure the payment of the Firm's post-petition fees and expenses, as allowed by this Court."

27.     Paragraph 7 of the First Interim Fee Application stated, "The Firm also seeks authority to apply the Retainer to outstanding fees and expenses."

28.     The Firm voluntarily agreed to reduce its request for immediate payment of fees sought in the First Interim Application to $20,000, which would come from the Retainer, thus freeing up estate funds to pay other administrative creditors. On March 11, 2009, this Court entered an order approving the requested fees and expenses and authorizing the application of the Retainer.

29.     In particular, both the proposed Order attached to the First Interim Fee Application and the Order that was entered provided, "ORDERED that the Firm is authorized to apply the Retainer to any outstanding fees and expenses; and it is further."[2]

---

[2]     Although it does not appear to be a basis for the Objection, the UST's comment in footnote 4 of the Objection that "[a] review of the First McGrail Fee Application and the Court's Order approving the application reveals that there was no reference therein to the Chapter 11 Retainer" is clearly inaccurate. See Obj., ¶ 23.

30.     The applicable pages from the First Interim Fee Application and corresponding Order are attached hereto as Exhibit F.

31.     The First Interim Fee Application certificate of service, which demonstrates that the First Interim Fee Application was served on the UST, is attached hereto as Exhibit G.

32.     On December 2, 2009, the Firm filed its second interim fee application (the "Second Interim Fee Application"), covering the period from February 1, 2009 through and including November 30, 2009, seeking $42,900 in fees and $61.17 in expenses.

33.     The Notice of Hearing on the Second Interim Fee Application stated that the Firm "only seeks immediate payment of $15,000 of fees, which amount would be payable entirely from a $15,000 carve-out from the secured lenders' collateral.  No fees would be paid from the debtor's unencumbered assets without further Bankruptcy Court order."

34.     In addition, the summary sheet for the Second Interim Applications stated: "This is the Firm's second interim fee application filed in this case.  By its first interim application, dated February 2, 2009, the Firm sought and was awarded $36,930 in fees and $258.38 in expenses but received payment of only $20,000 from its retainer."  It also disclosed that "[t]he fees would be payable entirely from a $15,000 carve-out from the secured lenders' collateral.  No fees would be paid from the debtor's unencumbered assets without further Bankruptcy Court order."

35.     Paragraph 8 of the Second Interim Application provided as follows: "On May 7, 2009, this Court approved a global settlement stipulation providing, among other things, for the reduction of the secured lenders' claim to $650,000.  In connection with that settlement

stipulation, the secured lenders agreed to carve out $15,000 (the "Carve-Out") from their collateral to cover the Firm's fees in this case."

36.     Paragraph 14 of the Second Interim Application provided as follows: "The Firm is only seeking immediate payment of $15,000 of fees from the Carve-Out at this juncture. It is not requesting any payment from unencumbered assets of the Debtor and will not be paid therefrom without further Bankruptcy Court approval."

37.     Paragraph 30 of the Second Interim Application provided as follows: "As described above, by this Application, the Firm is only seeking payment of $15,000 from the Carve-Out.  It is not requesting any payment from unencumbered assets of the Debtor and will not be paid therefrom without further Bankruptcy Court approval."

38.     Finally, Schedule A to the proposed Order specifically referenced, in two separate places, "the $15,000 Carve-Out."

39.     On December 30, 2009, this Court entered an order approving the requested fees and expenses (subject to a 10% holdback), with payment limited to the Carve-Out, which was specifically identified in the Order.  On January 4, 2010, the Firm was paid the Carve-Out.

40.     The applicable pages from the Second Interim Fee Application and corresponding Order are attached hereto as Exhibit H.

41.     The Second Interim Fee Application certificate of service, which demonstrates that the Second Interim Fee Application was served on the UST, is attached hereto as Exhibit I.

42.     Paragraphs 15-17 of the Final Fee Application describe the Retainer and the Carve-Out in detail.  Moreover, the Second Amendment to the Final Fee Application, which

was filed on September 8, 2011, prior to the Objection, states that the Carve-Out "means the $15,000 carve-out from the secured lenders' collateral, as agreed to by the Agent, the Committee, the Debtor, and the Firm in connection with the global settlement stipulation providing, among other things, for the reduction of the secured lenders' claim, and as previously disclosed in the Firm's second interim fee application, dated December 9, 2009, and applied in accordance with the Order approving that application."

43.     Finally, Paragraph 24 of the Joint Motion to Dismiss, states as follows: "Contemporaneously herewith, McGrail & Bensinger LLP, the Debtor's counsel has filed a final fee application seeking the allowance of $99,000.35 [sic] in fees and expenses, of which it is only seeking allowance of $64,000.34 for purposes of distribution hereunder."  The $35,000 difference represents the amount of the Retainer plus the Carve-Out.

44.     During this case, which has lasted almost three years, the Firm has not received any payments from unencumbered assets.  Nor has it raised its hourly rate, which has remained at $300/hour for the Debtor, while it is now $350/hour for most other clients.  Nor has it charged for travel time.  Nor has it charged for any services rendered after August 18, 2011.  Nor has it charged for the extensive time it spent addressing the issues raised by the UST with respect to both the Final Fee Application and the Joint Motion to Dismiss.  Nor has it charged for the time or costs associated with replying to the Objection.  Nor has it charged for the reimbursable expenses it incurred copying and serving the Final Fee Application and the Joint Motion to Dismiss.

45.     Even with the Retainer and the Carve-Out, the Firm anticipates that it will never be able to collect well over $43,000 of fees incurred in this case.  This is a meaningful loss for the Firm.

46.     Neither the UST nor any other party has objected to the reasonableness of the Firm's fees or any other aspect of the Final Fee Application.

47.     Finally, disgorgement of the Carve-Out and the Retainer would only increase the total distribution to non-professional administrative creditors by approximately $3,200.[3]

## ARGUMENT

48.     With a passing reference to the Bankruptcy Code and no case law support, the UST succinctly sets forth her first argument in Paragraph 52 of the Objection: "To the extent that the Court determines that the second settlement has not been disclosed adequately or approved by the Court, then it may be appropriate for the Court to consider whether to direct the McGrail Firm to disgorge these fees and return the sum of $15,000 to the estate. See 11 U.S.C. § 329." Obj., ¶ 52.

49.     The UST confuses the issue of Carve-Out disclosure with the issue of Settlement Stipulation disclosure.  The issue of Carve-Out disclosure may be relevant, and the Firm disclosed the Carve-Out in numerous places in multiple documents and sought and obtained Court approval of payment of the same, upon extensive notice, including notice to the UST.  On the other hand, the level of disclosure with respect to the evolution of the Settlement Stipulation as a whole is not relevant to whether the Firm is entitled to the benefits of the Carve-

---

[3]     Without disgorgement, the estimated total recovery to non-professional administrative creditors is $66,768.89 (total non-professional admin. claims) divided by $446,796.52 (total admin. claims, assuming $316,027.28 in allowed professional fees for Arent Fox LLP) times $152,806.56 (total funds) equals $22,835.27.

With disgorgement, the estimated total recovery to non-professional administrative creditors is $66,768.89 (total non-professional admin. claims) divided by $481,796.52 (total admin. claims, assuming $316,027.28 in allowed professional fees for Arent Fox LLP) times $187,806.56 (total funds) equals $26,026.82.

Out.  In any event, the Agent, the Committee, and the Debtor all properly agreed that a second motion regarding the Agent's concessions was unnecessary and the Firm informed the Court in December 2009 that the Agent had not been paid in full.  The Carve-Out should not be disgorged.

50.     Drawing from her objection to the Joint Motion to Dismiss,[4] the UST sets forth her second argument in Paragraph 53 of the Objection:  "Since the McGrail Firm has already received an aggregate payment in the amount of $35,000.00 on account of interim fee awards, the McGrail Firm has received more fees than it is entitled to receive under the distribution plan."  Obj., ¶ 53.  In other words, the Firm should be required to disgorge the payments it received from its Retainer and Carve-Out.  The UST cites absolutely no case law, in either objection, in support of this proposition.  In fact, Colliers and applicable case law overwhelmingly demonstrate that a professional is not required to disgorge its retainer/carve-out in an administratively insolvent case.

The Firm Properly Disclosed the Carve-Out

51.     The Firm's disclosure of the Carve-Out was prompt and extensive. Indeed, it disclosed the Carve-Out in the Notice of Hearing on the Second Interim Fee Application, which clearly stated that the Firm "only seeks immediate payment of $15,000 of fees, which amount would be payable entirely from a $15,000 carve-out from the secured lenders' collateral.  No fees would be paid from the debtor's unencumbered assets without further Bankruptcy Court order."  That notice was filed just two weeks after the Agent, the Committee, the Debtor, and the Firm agreed to the Carve-Out.

---

[4]      See ¶¶ 31 – 34 of the UST's objection to the Joint Motion to Dismiss (D.I. # 256).

52.     In addition, as set forth in detail above and in Exhibit H attached hereto, the Carve-Out was also disclosed in Paragraphs 8, 14, 30 of, and the summary page to, the Second Interim Fee Application, as well as in Schedule A to the proposed and entered Orders.

53.     Paragraph 17 of, and the Second Amendment to, the Final Fee Application also describe the Carve-Out in detail, and Paragraph 24 of the Motion to Dismiss cross references the Final Fee Application and states that the Firm is only seeking allowance of $64,000.34 for purposes of distribution.

54.      The UST's argument that the Firm should lose the benefit of its bargained for, disclosed, and approved Carve-Out strains credulity.

The Level of Disclosure Regarding the Settlement
Stipulation Has No Bearing on the Final Fee Application

55.     As demonstrated above, the Firm fully disclosed the Carve-Out and stated, on a number of occasions, that it was provided in connection with the Settlement Stipulation.

56.     Even if the UST is correct (which it is not) that the Debtor was required and failed to provide a more fulsome description of the Agent's concessions with respect to the Settlement Stipulation, that does not mean that the Firm should somehow lose the benefit of the Carve-Out, payment of which was approved by the Court in December 2009 after full disclosure. See In re Atlas Contractors, Inc., 2004 Bankr. LEXIS 802, *5 (Bankr. E.D. Ken. June 14, 2004) (whether debtor complied with post-conversion filing requirements irrelevant to determination of firm's right to compensation).  Notwithstanding the UST's arguments in the Objection to the Joint Motion to Dismiss, the Court is not reviewing a disclosure statement here, and it is not required to approach this issue as if it were.

57.      The UST's attempt to conflate these two issues, the issue of Carve-Out disclosure, and the issue of Settlement Stipulation disclosure, is unavailing.  The Carve-Out was

disclosed and approved and should not be disgorged. The Settlement Stipulation disclosure issue is a red herring.

**The Agent Was Authorized to Make Concessions Under the Terms of**
**the Settlement Stipulation Without the Need for Additional Court Approval**

58. Should the Court deem it necessary to consider the level of disclosure with respect to the Settlement Stipulation, the terms of the Settlement Stipulation itself, prevailing law, and common sense dictate that additional Court approval of the Agent's concessions was not required. Even if it was required, the Firm informed the Court that, as of December 2009, the Agent was still owed $150,000.

59. As a preliminary matter, Paragraph 12 of the Settlement Stipulation provided, "Except as expressly provided herein, this Stipulation may not be modified except in a writing signed by the Parties." Paragraph 15 of the Settlement Stipulation provided, "Each of the Parties agrees to execute and deliver, or to cause to be executed and delivered, and to take all such actions as the other parties may reasonably request to effectuate the intent and purposes and to carry out the terms of this Stipulation."

60. Thus, Paragraph 12 contemplated modification by writing among the parties and Paragraph 15 authorized the parties to take actions to effectuate the intent and purpose of the Settlement Stipulation.

61. That is precisely what happened. When, much to the surprise of all of the parties, the Debtor was unable to pay the Agent $650,000 by August 1, 2009, the Agent made concessions to ensure that the intent and purpose of the Settlement Stipulation (i.e., a reasonable, near-term distribution, with sufficient funds left over to administer the case) would remain intact, as contemplated by Paragraph 15. The Agent, the Committee, and the Debtor all agreed to those terms in writing, as contemplated by Paragraph 12.

62.     Thus, the written agreement among the parties was sufficient under the Settlement Stipulation itself, without the need for additional Court approval.

63.     Moreover, the case law supports the Agent's, the Committee's, and the Debtor's unanimous decision that additional Court approval was unnecessary.[5]

64.     Bankruptcy Rule 9019 provides that "[o]n a motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."

65.     There are a whole host of cases standing for the proposition that court approval is not required for every compromise, settlement, agreement, etc. under Bankruptcy Rule 9019.  See, e.g., In re George Milam Hall, 2010 Lexis 1487, *26 (Bankr. Kan. Apr. 28, 2010) ("It has been held [Bankruptcy Rule 9019] is simply procedural and, unlike the provisions of the Act from which it is derived, is not a substantive provision requiring court approval of compromises if such a requirement does not exist in the Code itself."); In re Novak, 383 B.R. 660, 669 (Bankr. W.D. Mich. 2008) ("Settlements relating to relatively insignificant or uncomplicated matters may not warrant the expense or delay associated with Rule 9019(a) approval"); In re: Commercial Loan Corp., 316 B.R. 690, 697, n.5 (Bankr. N.D. Ill. 2004) ("Strictly speaking, nothing in the Bankruptcy Code requires approval of settlements."); In re Telesphere Communications, Inc., 179 B.R. 544, 551 (Bankr. N.D. Ill. 1994) ("Although Rule 9019(a) discusses approval of settlements, the Rule creates a procedure, not a substantive requirement."); In re Git-N-Go, Inc., 322 BR 164 Bankr. N.D. Ok. 2004) (although Bankruptcy Rule 9019 limits the party who may request approval of compromise to trustee or debtor-in-possession, it does not impose a duty on the trustee to do so); In re Paul D. Levine, 287 B.R. 683,

---

[5]     As reflected in Exhibit B, counsel for the Agent first took the position that additional approval was unnecessary.  The other parties agreed.

690 (Bankr. E.D. Mich. 2002) ("Rule 9019(a) does not require the court to intervene in each and every instance where the trustee has reached a settlement. Rule 9019(a) does not state that the court 'shall' approve all compromises and settlements reached by the trustee. It provides only that the court 'may' approve a settlement or compromise, and then only if the trustee has filed a motion seeking such approval."); In re Dalen, 259 B.R. 586, 595-596 (Bankr. W.D. Mich. 2001) ("Rule 9019(a) is at best ambiguous as to whether court approval of a settlement is even required. . . . Rule 9019(a) states simply that the court '**may**' approve a compromise or settlement 'if' a motion is filed by the trustee. Nothing within Rule 9019(a) actually prohibits a trustee from settling a claim for or against the estate outside the purview of the bankruptcy court.") (emphasis in original).

66.     As described above, the Agent's concessions made in November 2009 with respect to the Settlement Stipulation inured to the benefit of the estate—the Debtor's payment obligations were deferred and additional funds were left in the estate. The Debtor gave nothing up. It would have been a complete waste of resources for any of the parties, including the Debtor, to have filed, and asked the Court to hear, a motion (likely on an expedited basis) authorizing those concessions.

67.     Indeed, the bankruptcy court in In re SGE Mortgage Funding Corp. (SGE Mortgage Funding Corp v. Accent Mortgage Services, Inc., et al.), 298 B.R. 854 (Bankr. M.D. Ga. 2003) arrived at the same conclusion in the context of a new arrangement that benefited the estate. Specifically, the Court stated:

> There was some argument whether the Amendment needed court approval. The parties agree and the record shows that the Amendment was never submitted to the Court for approval. However, only those changes that would be considered detrimental to the interests of the estate and the creditors, as a whole, would create a need for court approval. See generally *FED. R. BANKR. P. 9019*; *In re A&C Properties, 784 F.2d*

*1377, 1382 (9th Cir. 1986)….* In reviewing the Amendment, it does not materially change the obligations of SGE from the Settlement Agreement. In fact, it enhances the interests of the estate and the creditors, as a whole, because it entitles SGE to full payment of the amount agreed to in the Settlement Agreement, without the contingency of the Loan Pool sale to REMM. Therefore, court approval of the Amendment was not necessary.

Id. at 864.

68.     To the extent it is even relevant to the issue of disgorgement, there was ample support for the Agent's, the Committee's, and the Debtor's collective decision that a separate Bankruptcy Rule 9019 motion was unnecessary under the circumstances.

69.     Finally, neither the Debtor, the Firm, nor any other party was trying to hide the Agent's concessions under the Settlement Stipulation, the economics of the case, or anything else from the Court or any other party. Indeed, as reflected in Exhibit C, at the first hearing following the Agent's concessions, the Firm informed the Court that the Agent had been paid off, except to the extent of $150,000.

70.     The evolution of the Settlement Stipulation simply cannot be a basis for disgorging the Carve-Out.

<u>Administrative Insolvency is Not a Basis for Disgorgement of the Retainer or the Carve-Out</u>

71.     The fact that this case is administratively insolvent is not a basis for disgorging the Retainer or the Carve-Out.

72.     As an initial matter, Colliers section 331.05[2][c] states as follows:

[c] Prepetition Security Retainers Should Not Be Disgorged

In general, a professional who received a retainer prepetition to secure payment of fees, either both pre- and postpetition, or just postpetition, should not be compelled to disgorge the retainer in order to achieve equalization of distribution to creditors of the same class. n24 This is because the holder of the retainer is viewed as a secured administrative creditor, rather than an unsecured creditor. n25

(n24)  See, e.g.,  Rus, Miliband & Smith, APC v. Yoo (In re Dick Cepek, Inc.), 339 B.R. 730, 739 (B.A.P. 9th Cir. 2006) .

(n25)  In re Appalachian Star Ventures, Inc., 341 B.R. 222, 228 (Bankr. E.D. Tenn. 2006); In re Zukoski, 237 B.R. 194, 198 (Bankr. M.D. Fla. 1998).

L. King, Collier on Bankruptcy, § 3-331, at 331.05 (2011).

73.    There are numerous cases, in addition to the cases cited above in Colliers, that support this position.

74.    In In re Bay Voltex Corp., 2006 Bankr. LEXIS 3702 (Bankr. N.D. Cal. Dec. 29, 2006), the trustee and debtor's counsel disagreed about the manner in which the debtor's counsel's $15,000 retainer should be applied to its final fee application in an administratively insolvent case.

75.    "[The trustee] argues the retainer should be applied as against Warner's prorated share of the estate, calculated without regard to the retainer (as opposed to deducting the $15,000 from the allowance, and prorating the balance).  This, argues [the trustee], would result in a more equitable distribution to the officers of the estate in this administratively insolvent case."  Id. at *5.  The bankruptcy court rejected this argument.  It found that "Warner is entitled to the benefits of the retainer without need of sharing it" and held that "Warner must apply the $15,000 to his allowed fees and costs in the sum of $41,039, and that he is to be paid his prorated share of the remaining $26,039."  Id. at *6.

76.    This case is on point, and the court adopted the exact same approach of applying the retainer as set forth in the Joint Motion to Dismiss.

77.    In In re Atlas Contractors, Inc., 2004 Bankr. LEXIS 802, *3 (Bankr. E.D. Ken. June 14, 2004), the trustee filed an objection to the attorney's fee application on the basis that the attorney may not "draw down" the retainer but rather must turn it over to the trustee and

receive payment only on a pro rata basis with other Chapter 11 administrative expenses.

78.    The court flatly rejected that argument: "[T]he Trustee overlooks § 725 of the Code, which requires the disposition of 'any property in which an entity other than the estate has an interest, such as a lien,' before any distribution is made under § 726.  The Applicant holds an 'interest, such as a lien' in his retainer, so he is entitled to apply that retainer before unsecured administrative expenses may be paid."  Id. at *5.

79.    In Weinman, Cohen & Niebrugge, P.C. v. Peters (In re Printcrafters, Inc.), 233 B.R. 113, 116 (D. Colo. 1999), the trustee objected to counsel's application to the extent that it sought an order authorizing payment of approved attorney fees from the retainer prior to payment of all other administrative expenses.  Rejecting the trustee's argument, the court noted that:

> [M]ost bankruptcy courts have concluded that a prepetition retainer paid by a debtor to counsel for services in connection with a case is security for, or held in trust for, payment of fees and costs to be incurred. In re Printing Dimensions, Inc., 153 B.R. 715, 719 (Bankr. D. Md. 1993) (citing In re Kinderhaus Corp., 58 B.R. 94 [Bankr. D. Minn. 1986]; In re Chapel Gate Apartments, Ltd., 64 B.R. 569 [Bankr. N.D. Tex. 1986]; Matter of Colin, 44 B.R. 709 [Bankr. W.D. Mo. 1984]; Matter of Indep. Sales Corp., 73 B.R. 772, 774-75 [Bankr. S.D. Iowa 1987]; In re Chicago Lutheran Hosp. Ass'n, 89 B.R. 719, 734 n. 21 [Bankr. N.D. Ill. 1988]; In re Burnside Steel Foundry Co., 90 B.R. 942, 945 [Bankr. N.D. [**13] Ill. 1988]; In re Tri-County Water Ass'n, Inc., 91 B.R. 547, 551 [Bankr. D.S.D. 1988]; In re Leff, 88 B.R. 105, 107 [Bankr. N.D. Tex. 1988], aff'd sub nom. Stewart v. Law Offices of Dennis Olson, 93 B.R. 91 [N.D. Tex. 1988]; In re C & P Auto Transp., Inc., 94 B.R. 682 [Bankr. E.D. Cal. 1988]; Matter of K & R Mining, Inc., 105 B.R. 394, 396-98 [Bankr. N.D. Ohio 1989]; In re Crimson Invs., N.V., 109 B.R. 397, 402 [Bankr. D. Ariz. 1989]; In re NBI, Inc., 129 B.R. 212 [Bankr. D. Colo. 1991]; In re Hathaway Ranch Partnership, 116 B.R. 208, 216-218 [Bankr. C.D. Cal. 1990]). Indeed, the bankruptcy court noted this doctrinal trend and cited several other cases which support this proposition. (R., Doc. 211 [Krieger's Order at 5 (citing, inter alia, In re North Bay Tractor, Inc., 191 B.R. 186, 187 [Bankr. N.D. Cal. 1996]; In re Dees Logging, Inc., 158 B.R. 302, 306-07 [Bankr. S.D. Ga. 1993]; In re Matthews, 154 B.R. 673, 676 [Bankr. W.D. Tex. 1993]; In re Viscount Furniture Corp., 133 B.R. 360,

365 [Bankr. N.D. Miss. 1991]; In re McDonald Bros. Constr., Inc., 114 B.R. 989, 1000-02 [Bankr. N.D. Ill. 1990])]).

Id. at 118.

80.    The court also remarked that "[t]he validity of prepetition cash retainers to compensate bankruptcy attorneys for their services following a chapter 11 petition is so widely accepted that it is rarely even an issue in bankruptcy cases." Id.

81.    It concluded that "WC&N properly accepted a prepetition 'security retainer' in cash from the debtor. Having complied with the fee application process, WC&N is now entitled to be paid from the retainer and shall not be required to share the security with other administrative claimants." Id. at 120. See also Commonwealth of Pa. v. Cunningham & Chernicoff, P.C. (In re Pannebaker Custom Cabinet Corp.), 198 B.R. 453, 460 (Bankr. M.D. Pa. 1996) (prepetition security retainer was not subject to disgorgement simply to obtain parity among administrative claimants where funds were insufficient to pay administrative claimants in full, absent evidence of excessive or unreasonable nature of retainer); In re North Bay Tractor, Inc., 191 B.R. 186, 188 (Bankr N.D. Cal. 1996) (rejecting argument "that since retainer is property of the estate, attorney must disgorge [it] so that other claimants of equal priority receive equal dividends" because "such a rule would undermine the purpose of retainers and chill the willingness of many professionals to undertake representation of Chapter 11 debtors"); In re Printing Dimensions, Inc., 153 B.R. 715, 719 (Bankr. D. Md. 1993) (counsel "will not be required to share a prepetition retainer pro rata with other administrative claimants").

82.    Carve-outs are likewise entitled to protection from disgorgement—not only is a carve-out earmarked for the specific purpose of paying certain fees, but it is not derived from property of the estate and therefore is not recoverable by the estate. In In re US Flow Corp., et al., 332 B.R. 792, 795 (Bankr. W.D. Mich. 2005), an administratively insolvent case,

the United States Trustee requested that the court determine that a $55,000 carve-out for professionals was property of the Chapter 7 estate, to be distributed according to the priorities of the Bankruptcy Code. See id. at 795.

83.     In denying the United States Trustee's request to disgorge the carve-out, the court concluded that "[t]he carve-out funds are not now property of the bankruptcy estate and are not recoverable by the estate for the benefit of all of its creditors." Id. at 798.

84.     The same arguments against disgorging the Retainer apply equally to the Carve-Out. Moreover, because the Carve-Out was paid from the Agent's property, not from property of the Debtor's estate, there is no justification for disgorging it and sending it back to the entire estate.

85.     These decisions make sense from a policy perspective. The purpose of a retainer, carve-out, or any security interest, for that matter, is to protect the holder. It simply cannot be that the holder is stripped of that protection at the very moment that it needs it most (i.e., when a case is administratively insolvent). Moreover, without enforceable retainers and/or carve-outs, many professionals would hesitate to undertake Chapter 11 debtor representations.

86.     Treatises, case law, and policy overwhelmingly support the Firm's right to realize the benefit of its Retainer and Carve-out in this administratively insolvent case.

The Equities of the Case Weigh Against Disgorging the Carve-Out or the Retainer

87.     If the Court deems it appropriate to consider the equities of the case, they weigh heavily against disgorging either the Retainer or the Carve-Out.

88.     The Firm is the second largest administrative creditor in the case because it has not received a payment from unencumbered assets in three years. This does not mean that the Firm has conspired to place itself in a better position than other administrative creditors. To

the contrary, it means that, while many other administrative claimants were paid during this case, the Firm was not, as demonstrated by the relatively small amount of non-professional administrative claims that remain unpaid at this juncture.

89.    Even if the UST's objections are overruled in full, the Firm still stands to lose over $43,000 of pre-August 18, 2011 fees, the reasonableness of which has not been questioned by the UST or any other party, not to mention the substantial time and expense it has incurred post-August 18, 2011, for which it has not even sought payment.

90.    Disgorgement of either the bargained-for Retainer or the Carve-Out would be a significant financial blow to the Firm, especially when coupled with the results of this case otherwise, whereas it would only increase the total distribution to non-professional administrative creditors by approximately $3,200.

## CONCLUSION

WHEREFORE, the Firm respectfully requests that the Court overrule the Objection, enter the proposed form of order attached to the Final Fee Application, and grant such other and further relief as is just and proper.

DATED:    September 29, 2011
          New York, New York

MCGRAIL & BENSINGER LLP

s/ David C. McGrail
David C. McGrail, Esq. (DM 3294)
676A Ninth Avenue #211
New York, New York  10036
Telephone:  (646) 290-6496
Facsimile:  (646) 224-8377

Counsel to YCMTSU, LLC (f/k/a HydroGen, L.L.C.)

DATED: September 29, 2011
New York, New York

LAW OFFICES OF DAVID C. MCGRAIL

s/ David C. McGrail
David C. McGrail, Esq. (DM 3294)
676A Ninth Avenue #211
New York, New York  10036
Telephone:  (646) 290-6496
Facsimile:  (646) 224-8377

Former Counsel to YCMTSU, LLC (f/k/a
HydroGen, L.L.C.)